Case No. 151728 and Case No. 151743, which involves the same parties but on opposite sides of the appellate spectrum. Mr. Lieberman and Mr. Murray, I don't think there's a need to change tables between arguments. And I also would encourage you to the extent possible to not repeat anything that has to do with the technology. We certainly understand it. We've read everything you've submitted. I commend both of you on the quality of your briefings. So it's possible that at least the second argument won't entail the full amount of time that's allotted. But I'll give it to you if you, in fact, think that you need it. So as I understand it, Mr. Lieberman, you want five minutes for rebuttal in the first case? That is correct, Your Honor. Okay. You ready to proceed? I am. All right. Okay. Go ahead. Judge O'Malley, and may it please the Court, the Supreme Court in the Alice case, before reaching its conclusion that the patent claims in that case were patent ineligible, asked two questions. One is, do the claims purport to improve the functioning of the computer itself? And CBOE does not contend that the claims here purport to improve the functioning of a computer. The second question the Supreme Court asked- So you're conceding step one of the Alice test? No, we are not. You're not? No. Step one is the question of whether or not- The claims are directed to an abstract idea. That's correct. We are not conceding that. Okay. The Supreme Court asked these two questions at the end of its Alice analysis. The first one is, do the claims purport to improve the functioning of a computer? And the second is, do the claims affect an improvement in any other technology, other meaning other than a computer, or technological field? And it's our position that the claims in this case affect an improvement in a technological field. The technological field is the field of automated exchange trading systems. That is a claim element. The PTAB erred below in concluding that it was not for three reasons. First, as this court indicated in the BI versus Shearing case, even if there is no antecedent basis in a preamble, the preamble is still limiting if it is the essence of the invention or the raison d'etre of the invention. That was the language that this court used. Here, we have automated exchange trading system in the title of the patent, in the first sentence of the abstract, in the very short field of invention, in the first sentence of the summary of invention, and throughout the specification. It is critical to the invention. Moreover, there was a close correlation between the language in the preamble and the language in the subsequent steps of the claims, such that the claims do not make sense without the preamble being considered a claim limitation. Are you then contending that you might have a situation where you could be simply implementing an abstract idea upon the initial computerization, but then after the fact, if a problem is realized through the computerization, that you then can have a subsequent patent that would be patent eligible? Exactly correct, Your Honor. I think the DDR case, the majority opinion in the DDR case, goes precisely to this point. In that case, you recall the technology involved was when someone clicked on a link in a website, making it look as if, when the person traveled off the website, that they were still on the website. And the panel decision there said two things. First, this addressed a problem that did not exist in the bricks-and-mortar context. That is, it was a new problem caused by the Internet. So what's the new problem that was resolved here? The Delta claim D of the patent, is that what you say is new, the new technology? The new problem is this. When automatic exchange trading systems were created, they created a new type of risk, not a new variation of risk, a new type of risk that never existed before. So, for example, I think everybody will remember in the Trading Places movie, when somebody came into the options pit and they wanted to do a trade, Eddie Murphy had to make a little movement with his finger saying, I acknowledge the trade, I accept. That's what happened in the open outcry system. You could not do a trade. Your quote could not get hit as a market maker unless you made a conscious decision to do that. With an automated system, all of a sudden, you could have tens, hundreds, thousands of quotes hit without your knowledge and without your participation. And Maureen O'Hara, ISE's expert, has admitted these differences in her testimony and the underlying proceeding, and we've cited those in the record. We understand the concepts that you're saying, put aside the fact that this is the first time probably anybody mentioned Eddie Murphy in a Federal Circuit argument. Actually, this is the second time I've heard it. I think what my problem is, is that I understand the distinction you're making and I understand the distinction made in DDR holdings. The problem is, is that that distinction has to be supported by the claims. So even assuming that you're talking about an automated system and even assuming that you are contemplating that some things occur because of the automated system, there still has to be something inventive about what you are claiming. So let's give you the preamble being limiting, though I'm not sure that's absolutely necessary. But if we give you that, what in the claims? There's storing and undefined modification. How is that enough? The answer is twofold. The step that has the critical portion of the invention is the automatically modifying the remaining quotes that are in the system. There were no such remaining quotes in the open outcry system. Again, Maureen O'Hara at pages 1752 to 1756 of the appendix talked about, admitted the differences between open outcry and under an automated exchange trading system. But even assuming that, we're in the automatic system. Okay. There were no remaining quotes because you didn't have any place for them to remain. Right. But isn't the fact that there are remaining quotes and that you then store them, isn't that sort of a necessary implication of the automated system? Well, the storage of the quotes is the automatically modifying is a disruptive event to the way automated exchange trading systems typically work, just the way the technology in DDR was found to be disruptive by the majority of the panel. Here's why. In a normal automated system without our invention, what would happen is if a market maker decided that there was too much risk, he would then put in new quotes. Those would go to the end of the queue. But before it got to the front of the line, he could have been hit on hundreds or thousands of existing quotes. What this invention does is it has the system modify a modification in the system so immediately the quotes are modified. It's not something that's done by the market maker. So you're referring to hedging risk. No. Why is this not hedging risk? Well, it's not hedging risk because what you have here, the automated exchange trading system is essentially an exceedingly complex machine. And, I mean, think about it. There are only about 15 to 20 exchanges in the United States. But ClaimMath recites automatically modifying at least one of the remaining said specified ones or said quotes in the quote group if said threshold is exceeded. That's right. So if you exceed a threshold, then it modifies the remaining quotes. That's a risk-taking or a risk-hedging behavior. Well, I think it's no more related to risk-taking than if you have an airbag, which you put in a car to mitigate the risks of somebody being injured in a crash, or a bulletproof vest that somebody wears to mitigate the risk of being injured by a bullet. The key here is not that the ultimate result is that the market maker is protected. It's that you are changing the system, which is a complex machine. And, by the way, the preferred embodiment in column three of the patent talks about certain computer systems. The Sun and the Starfire system, those are not off-the-shelf computers, which is something that the PTAB concluded without any basis. Those are computers that cost hundreds of thousands of dollars or millions of dollars. The Starfires are crazed supercomputers. Let's go back to what this patent does and what these claims recite. So you do concede that claim F, or paragraph F, refers to or deals with risk-hedging. Well, what it deals with is it deals with modifying, having the system modify the existing quotes. It's an improvement to the machine. It's an improvement to the system. But it modifies existing quotes in order to address potential risk. If I may take a step back, Your Honor, and answer your question this way as a policy matter, the Supreme Court declined the invitation made by many to set out a separate category for business method patents and say that they are per se patent ineligible. If this court is going to say that just because an invention touches on the concept of risk, that's going to implicate essentially every financial patent there is. Don't take my questions to express that type of a policy. I'm just trying to understand how what you're advocating to us that's new here and the element that we should focus on, I'm trying to get you to articulate that element because my next question is going to be how is this different from Alice, the risk hedging in Alice. The newness we know because of the result in the IPR proceeding. There is a new risk and a big difference between what is covered by this patent and what was done previously. We know that it's not routine and conventional because the same PTAB panel found that it wasn't invalid as anticipated or obvious, and I know we'll be speaking more about that probably a little later this morning. We know that it's new and it's different. It's a new type of risk. It's embodied in an exchange trading system, which are machines, cables, software code, millions and millions of dollars that transact, transactions involving trillions of dollars every day. You can't get much more real than that. How is this different than Alice? I would turn it around and say the only way it's the same is that it involves financial transactions and at the highest level of abstraction, it involves risk. In the Alice case, the Supreme Court said there was nothing new and you can't get a patent just by taking something that's old and doing it on the computer, even if it's faster and better on the computer, and we agree with that. Well, it seems to me that up until you get to F, that everything above that is something that's been assigned to a computer. I mean, you're describing a system under the open outcry system, except that you're now doing it on a computer, receiving orders, generating a trade, storing the orders, determining a quote, comparing said aggregate risk. Judge Winn, I agree entirely that these steps are done on a computer. Let me advert for a second to what the Supreme Court said in Alice in discussing the Deere case. The Supreme Court said the claims in Deere were patent eligible because they improved on an existing technological process, not because they were done on a computer. There was a computer in Deere. That isn't what made those claims patentable, and the fact the computer is being used isn't what makes the claims patentable here. What makes them patentable is that there is a problem, a new type of problem created by automated exchange trading systems with an entirely new type of risk, and this invention cured that problem created by the Internet in a disruptive fashion. And the technology here, again, we're not talking about a conventional scanner or a copier or even a laptop computer. These are supercomputers. These are hundreds of thousands of dollars, these machines. This was in the Sandholm Declaration, which the PTA really paid no deference to, even though there was nothing on the other side. I see I only have a few minutes left, and I would like to save some time for rebuttal, but I do want to answer any other questions the Court might have right now. Okay. We'll give you three minutes for rebuttal. Thank you, Your Honors.  May it please the Court. I'd like to do what SIBO has been very reluctant to do from the beginning of this case, which is address the two-part test in ALICE for determining whether we have patent-eligible subject matter here. ALICE Step 1 says we have to see if we have an abstract method embodied in the claim, and we clearly do. As the Board concluded below, they said, we conclude that the concept of managing trading risk is an economic practice long prevalent in our system of commerce and squarely within the realm of abstract ideas. They really said nothing. But trading risk, all right, in your particular case, you are talking about trading risk as it relates to these classic exchanges, correct? It doesn't have to be in an exchange, actually. The sort of basic economic practice could apply to other fields as well. Would you concede that you could have a situation in which the initial automation of an idea is just automation with a generic computer of an abstract idea, but if that automation itself generates an additional problem that was unknown before, that a new patent could be patent-eligible? If they claim the solution to that problem in their claims, then I think that's possible, Your Honor. That's what I want to focus on, because, yes, just managing risk, that's like a red flag, right, that goes off for everybody because of Bilski, and we know what the Supreme Court was looking at there. But assume there was no risk related to sort of the amassing of quotes that occurs as a necessary incident of the automation. Could there be a patent that claims a solution to that additional risk that wouldn't just be addressing the abstract idea of risk? I think it's possible, but it's not this patent. It's not this claim. That's what I want to focus on. Right. This claim, the risk in this claim is very clearly set forth in the claim. It's about the risk of, first of all, there's a risk level associated with each trade, and this claim is directed specifically in its language to avoiding having that aggregate risk getting too large. So as a trader is trading, each trade has a risk associated with it, and we describe in the brief this Greek delta, which is sort of a measure of risk. So when the trader is trading, the trader is adding up those deltas, and this is what was done in open outcry. And when that delta became too large, uncomfortably large, as admitted by SIBO's expert, there would be some hedging to bring that delta back down. That's the risk that's called out in the claims. Okay. What language are you focusing on in the claims for that? I'm focusing on determining a risk level and an aggregate risk level. Now, that risk level is the risk associated with a trade. The aggregate risk level is simply adding up the risks associated with each trade. So if your first trade has a risk level of one and your second trade has a risk level of two, now your aggregate risk level is three. And market makers would have a threshold sort of tolerance for risk, and when they crossed that threshold tolerance, what they would do is they would modify their remaining quotes, and that's what happened in open outcry. It's exactly the same process. What if your remaining quotes are 1,000? I mean, that didn't happen on the trading floor, right? Well, first of all, the idea that the trades were not sort of displayed or stored on a trading floor is not true. Quotes were stored in open outcry. Mr. Kaminsky admitted that, quote, market makers would determine the quotes, which were in most cases post on large monitors, mounted in rows above the pit. This is at A1494 in the record. So even in open outcry, the market makers would put their quotes up on a board, and there would be lots of quotes there. So now in open outcry, when the market maker is trading and monitoring his or her risk, when that risk became too large, even the background of the 498 patent tells us that what market makers would do is they would adjust their pricing to hedge away that unwanted risk. That's right in the background of the 498 patent. And that appears at column one, lines 43 through 55. So the risk of the claim is the same risk that existed in open outcry, where market makers would monitor their risk and then make adjustments when that risk got too high. All they did was implement that. You don't see that there's a difference between the risk and an exponential volume of that risk? Well, first of all, there's nothing in the claims about the volume of the trades. So again, a lot of what's in SIBO's briefs, and what Mr. Liebman was just talking about, is we've got thousands of trades and we have millions of lines of code. None of that is in the claims, which is what the board focused on below. The claims require nothing other than a plurality of quotes, two quotes. So if they have some unique solution to how to deal with millions of quotes, it certainly isn't claimed. There's nothing in the claim that requires that. I know the case isn't binding on us, but do you see a distinction between this case and trading tech? Yes, I see a big distinction. Trading technology is what they claimed was a unique graphical user interface. So it was a GUI, graphical user interface, that arranged data in a certain way, that presented the data in a unique way to the market makers that were doing the trading. So that is rooted in the technology. It's a graphical user interface. So that had no analog in the open outcry market. It wasn't something that market makers would do with pencil and paper, for example. It was a unique graphical interface that changed in a certain way. So it's very different technology. Can you address the step that's recited in F of Claim 1 in terms of what your opponent was saying to my questions? Well, Mr. Lieberman was saying that he thinks it's significant that the modification is done automatically. I think he was even more limiting than that when he said that it's done to remaining quotes. Right. Well, again, that's exactly what happened in open outcry. Market makers in open outcry would have quotes posted on the board behind them in the pit. For some reason, SIBO has focused on the fact that in a pit, you have multiple market makers instead of just one. So the quotes are sort of pit quotes, not quotes for particular market makers. But, again, the claim doesn't say anything about that. The claim is just dealing with quotes. But you certainly had remaining quotes. And, Your Honors, even if it's audible, even if it isn't stored, which it was stored in open outcry, but if I'm a market maker and I'm saying, here's my quote for this IBM option, and then somebody trades with me and is buying a lot of that particular option, and I decide that I want to change the price, I say, here's my revised price for that IBM option. The fact that I'm saying it out loud, modifying my quotes orally, why is it patentable to just take that and implement it on a computer? It really isn't. So what you're saying is that there might be conceivably a way in which the danger of collating or amassing huge volumes of quotes could be addressed by a patent-eligible claim, but this claim is too broad to get there. This claim doesn't even begin to touch on that kind of thing. So when you look at their briefing, what they're talking about are message queues, and things are being processed in the order that they're received. And an execution message, if it's sitting in the message queue behind an order, these are the problems that they're talking about in the electronic world, which this claim has nothing to do with. This claim is just taking the basic abstract operation and automating it. And just getting back to Alice for a minute. Why wouldn't it have been anticipated under 102? I know we'll get there in a minute. I think it is. I mean, I'm certainly happy to talk about the IPR issue. There's nothing at all inconsistent about the IPR. Before you get into that, how about responding to his analogy to the DDR case? Sure. DDR solved a problem that was sort of rooted in technology. It's about when you click a hyperlink in the Internet, instead of going where you would normally go, which is out to a different website, the invention was, let's say I'm in a Home Depot website, and I'm looking at a Kohler faucet, and I click on the Kohler hyperlink. In the prior art, I would jump to the Kohler website. So now Home Depot has kind of lost that customer, lost control of that customer, because they've jumped to the Kohler website. And so the invention there was, instead of that hyperlink jumping to the Kohler website, I'm going to create within the Home Depot website a little sort of Kohler page to maybe sell that faucet, but I keep my customer within the Home Depot website. So this is something that is solidly sort of rooted in technology in DDR. Now, I think there's an argument... Well, maybe another way of looking at it is that DDR resolves a problem that's specific and peculiar to the Internet. And Mr. Lieberman is saying that what especially Step F does, it resolves a problem that arose out of prior methods of automating the exchange system. So this resolves a problem that didn't exist but for prior. So this advances technology. It's Internet-based. Well, I'd like to talk about that. The so-called problem that Mr. Lieberman is addressing is what happens when you separate the trading from the risk analysis. So in open outcry, the market maker would do a trade, would see how that trade affected his or her risk profile. Is my risk getting too large? Make some adjustments and do another trade. It was always known that whoever or whatever is doing the trading has to do the risk analysis. So now Mr. Lieberman, or SIBO, sort of hypothetically says, well, what if we had an electronic exchange that took the trading away from the market maker to a computer down the road, but the risk analysis is left back with the market maker? So now you have separated the trading from the risk analysis. Well, now you have a problem because the computer is going to do the trading very quickly, and if the market maker is sitting back in his or her office trying to do the risk analysis as the trades happen, well, a human can't keep up with a computer, so you have this kind of mismatch. But this is a hypothetical that didn't exist, first of all, in the real world. There were no exchanges that did that, and it's illogical. You're saying there were no exchanges in the United States that did that? Well, no, there were no exchanges anywhere that did that. The exchanges in Europe were really kind of hybrid exchanges. Market makers would put, for example, one quote into the electronic exchange and see if it matched, and if it matched, maybe they'd make some adjustments, and they'd put another quote in. It was really kind of like open outcry, sort of a hybrid open outcry electronic system. But there was no system that took away the trading completely from the market maker. Does the problem have to exist in the real world? You can't anticipate a problem that's going to be created by the automation? Sure, you could anticipate a problem, but again, what happened in open outcry, the basic economic practice here is trade, do your risk analysis, do another trade, do your risk analysis. That's what market makers did. So it's not statutory to automate that entire process. It's illogical. But the claim at its core does nothing but automate sort of both halves of that. It automates the trading and it automates the risk analysis. Now, if I could get back to, I mean, I think we haven't talked about Alice Part 1 and Part 2. I mean, SIBO doesn't want to talk about Part 2 of Alice because what you have to do is you have to look at the additional elements beyond the abstract method that are in the claim and explain why those additional elements impart patentability. And there are no additional elements in this claim. When you take out the abstract method, all you have left is automatically modifying. And that certainly isn't something that would add something sufficient to the abstract method to make it patent eligible. So SIBO never talks about Step 2 of Alice, and they don't talk about it because they have nothing to say about it. Now, I'd like to address a couple of other things. First of all, the preamble issue, only one patent out of the three even has automated electronic exchange in the preamble, something that SIBO kind of glosses over. So if automated electronic exchange is so critical, why isn't it in all three of the patents? So the preamble in this one patent, the 498 patent, is really just an intended use. The other claims in the other patents talk more generally about a system. So there's no reason that preamble should be limiting. I was going to talk about the IPR a little bit, if there are any questions about that. I think there's a lot of confusion there in SIBO's papers about the IPR, maybe intentionally. But the issue about novelty only applies to the second step in Alice. So you don't get over the one-on-one hurdle even if you have a novel abstract idea. This court made that clear in Ultramershal specifically, which talked about that. The so-called search for novelty or the novelty issues in Alice come in only with respect to the additional elements. So if there was some additional elements added to these claims beyond the abstract method, and those additional elements were really new and innovative technology, then they might have a case for why that would be relevant. Give me an example beyond DDR where you would see an additional element that if you say you fail the first prong, that there is an abstract idea that you're definitely dealing with, but you're improving upon the automation or there's something else that occurs that could give rise to patent eligibility because of the novelty of the additional element. It's possible if they had claimed some of the things that they talk about in their brief, like you have a message queue and you have orders and cancellations that come into that message queue. If the cancellation is behind an order, maybe you don't process it in the order in which it's received. This is the so-called problem. So maybe you take cancellations out of order in the message queue and you process cancellations first. I don't think the patent actually discloses that, but we're talking hypothetically. So if you had a claim like that that was really rooted in what's going on in the computer and in the technology, it's possible that that kind of claim could be patentable. So you're saying the patent doesn't really claim that because the use of the word modification in light of the spec couldn't be interpreted to claim that? Well, it doesn't. It says all you do is you modify one of the remaining quotes, and in the specification they talk about just changing the price, for example, which is what market makers did in open outcry, of course. Okay. All right. Well, we'll save the rest of the discussion for the next case, but you have three minutes, Mr. Lee, to respond. Thank you, Your Honor. Thank you, Your Honor. Let me begin with the last point that Mr. Murray made. The step F, the automatically modifying, does relate to, and the purpose of it is, one of the purposes is to fix the message queue problem, and the message queue problem was specifically identified in the specification of the patent at column 2, line 21. That's why it's important that the system automatically modify the quotes because it does that before all those quotes in the message queue can be hit. Why, I mean, they do, the spec does discuss that some of those things occur or that you perceive some of those problems, but the claims are so broad that they don't really say anything about that. Well, I don't believe that the law requires that in the claim itself you specifically repeat the problem that you're fixing. Here in the claim we deal with the specific solution that fixes the problem talked about in the specification, and the solution is the automatically modifying. The purpose of the automatically modifying is to make sure that that new type of risk doesn't redound to the detriment of the market maker. That is, that the market maker doesn't get hit, doesn't have quotes hit, 10 quotes, 100 quotes, 1,000 quotes, and by automatically modifying those quotes you eliminate the message queue problem. I would submit you don't have to repeat the problem in the claim. Have I answered your question? Yeah, I'm still at somewhat of a loss as to how you say that automatically modifying, that we are supposed to assume that it does things like alter the orders of the quotes and it's not just addressed to the price of the quote. Right, so let me answer that question very directly. You can modify the quotes in a number of different ways. You could modify them by withdrawing them. You could modify them by changing price. You could modify them by changing volume. There are a whole variety of different ways that, in general, a quote can be modified. We didn't have to, I would submit, limit the claim to particular types of modifications. If the problem out there for the market maker is that he's got 10,000 quotes with respect to the stock in BP and the BP Horizon oil rig just blew up, he may decide to take all those quotes off the market. But he can't because he can't get there first. The quotes are already up there and people, particularly with the computerized trading, can hit those things in a matter of microseconds once the news comes out. So automatically modifying the quotes, the system, once that first quote is hit, the system will automatically modify the quote in a way so that the market maker doesn't lose 30 years of accumulated savings from working. It does it immediately. It does it automatically and it fixes that problem. We know it's a new problem and we know it's very different from what existed in open outcry because in two places in her testimony, Maureen O'Hara, their expert, admitted the differences both as to risk and to the way things worked in open outcry. This is the appendix at 1752-56 and the appendix at 1834-35. She also admitted in those sites that the steps that are in the claim are by and large steps that would not have been done by a market maker. These are steps that are done by an exchange. So almost all the steps here relate to what the exchange, the machine, does and it's an improvement to a machine. And let me analogize this to a case that on first blush may seem to be very different, but I would submit that it's very, very closely related, and that's the Supreme Court's case of Deere. In Deere there were essentially three categories. I'm sorry, your time is up and you actually talked about Deere the first time around, but we get it. I mean, it's in your briefs too. Thank you, Your Honor. We've probably read Deere more than we ever cared to.